IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| CHRISTINA K. LOFTIS, | ) | |
| | ) | |
| Plaintiff, | ) | 8:12CV212 |
| | ) | |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, | ) | MEMORANDUM OPINION |
| Commissioner of the Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the Court for review, pursuant to 42 U.S.C. § 405(g), of the decision of defendant Commissioner of the Social Security Administration ("SSA") denying social security disability benefits ("SSD benefits") to plaintiff Christina K. Loftis.  Upon review, the Court finds the SSA's decision is not supported by substantial evidence and should be reversed, and the matter will be remanded for award of Ms. Loftis's SSD benefits.

## I. BACKGROUND AND PROCEDURAL HISTORY

As an initial matter, it must be noted that although the Administrative Law Judge found that Ms. Loftis had several severe impairments, namely, "borderline intellectual functioning, diabetes with neuropathy, obesity, hypertension, partial amputation of digits on the left foot, depression, and anxiety" (Tr. 23), Ms. Loftis concedes that other than the borderline intellectual functioning, her impairments "were established after

the alleged onset date/date last insured" (Filing No. 13, at 8).
Consequently, Ms. Loftis is only challenging the SSA's
determination that her borderline intellectual functioning does
not render her disabled.  The Court, likewise, will focus on Ms.
Loftis's mental impairment, borderline intellectual functioning,
and will evaluate her physical impairments and her psychological
impairments as relevant.[1]

Plaintiff Christina Loftis was born in 1976.  She
graduated from Central High School in Omaha, Nebraska, in 1995,
but she claims that all of her classes, in every grade, were in
special education (Tr. 47-48).  Ms. Loftis attended college for
about seven weeks in 2004 but abandoned her studies because she
had difficulty with English and math classes (Tr. 62-63).

Ms. Loftis is married to Chris Loftis, and she has four
children, three of whom are the biological children of Mr.
Loftis.  As of the date of the hearing before the Administrative
Law Judge ("ALJ"), December 2, 2011, the children were fifteen,
twelve, six, and three years old (Tr. 46).  Six weeks before the
date of the hearing, all four children were removed from the home
by Child Protective Services and placed in foster care due to

---

[1] During the period relevant to this appeal, Ms. Loftis had
numerous medical examinations relating to her impairments, as
well as other unrelated medical issues.  These examinations are
well documented in the record.  The Court will call attention
only to those medical records that have particular significance
for the appeal at hand.

-2-

allegations that Ms. Loftis abused another child who was living
in their home, the child of an ex-girlfriend of Mr. Loftis (Tr.
46, 458).  The Court has no further information as to the
resolution of the children's placement in foster care.

Ms. Loftis alleges that she has been disabled since
December 31, 2006 (Tr. 146).  Ms. Loftis originally filed initial
applications and was denied disability insurance benefits and
social security benefits in 2009.  She testified at the ALJ
hearing that she did not appeal the 2009 denial because she did
not understand the letter sent to her by the SSA (Tr. 60).

On March 19, 2009, in connection with her 2009
disability applications, Ms. Loftis was seen by Caroline
Sedlacek, Ph.D., for a psychological interview and report ("2009
Sedlacek Report," Tr. 244-249).  Dr. Sedlacek reported,

> [Ms. Loftis] gave the current date
> to be March 18, 2008 and Wednesday.
> (It was March 19, 2009 and
> Thursday.)  Also, she had put 2008
> on the background information form
> that she completed.  She recalled
> two of three words on a short-term
> delayed memory task with
> interference.  She was unable to
> count backward by 3's from 30. She
> was able to recall five digits
> forward and three digits backward.
> She knew that a "black guy" was
> president and that Bush had been
> president.  She missed other simple
> information questions.  By counting
> on her fingers she was able to do
> very simple addition, subtraction[]
> and multiplication calculations and
> did not know how to solve a simple

-3-

division problem.  She could not
explain a simple proverb.  She gave
a similarity and a difference.
. . .  Intellectual functioning
appears to be within the Borderline
range.  Insight is poor. . . .

The claimant has the ability to
carry out simple activities of
daily living and functions better
with some assistance.  Due to her
lower intellectual functioning and
lack of knowledge about the world
around her she has some difficulty
maintaining social functioning.
Although she readily admits to
being depressed and becomes
stressed easily, she is not under
the care of any mental health
professional.  She has some
difficulty maintaining
concentration and attention needed
for task completion.  She was able
to recall two of three simple words
on the short-term delayed memory
task.  She had difficulty recalling
digits backward.  She would have
some difficulty remembering short
and simple instructions even though
she might be able to understand
them.  Even when she can remember
short and simple instructions, she
would need some additional
supervision in order to carry out
those instructions.  She would
relate to coworkers and supervisors
in a shy, nervous manner.  She can
adapt to simple changes in her
environment but functions better,
of course, in a predictable,
structured environment.  She does
not have the intellect and
experience to manage her own funds.

(Tr. 248-49).

Dr. Sedlacek's Diagnostic Impression included the following:  "Axis II:  V62.89 Borderline Intellectual Functioning . . . Axis IV:  Stresses of parenting, inadequate health care due to lack of insurance, lower intellectual functioning, financial concerns  Axis V:  50/50" (Tr. 249).  "PROGNOSIS:  Prognosis is poor.  She likely has been making a poor to marginal adjustment during all of her life. . . .  It appears that the claimant has never held a job.  She lacks basic job skills.  It is unlikely that she will be employable in the next two years, at least" (*Id.*).  "ABILITY TO MANAGE FUNDS:  Due to her level of intellectual functioning and lack of knowledge about the world around her, it would not be in this claimant's best interests to manage her own funds" (*Id.*).

On March 24, 2009, Ms. Loftis underwent examination by Gerald Spethman, M.D., a state agency reviewing physician, who completed a Physical Residual Functional Capacity ("RFC") Assessment (Tr. 263-71).  Dr. Spethman listed Ms. Loftis's diagnoses as "Obesity," "DM type 2," and "Left foot – Partial Digits AMP" (Tr. 263).  Dr. Spethman wrote, "CRED - the claimant has a lot of problems due to her obesity and not good balance - she appears CRED," which the Court interprets to mean "credible" (Tr. 268).

On April 4, 2008, Ms. Loftis was seen by a nurse for a home visit because of "impaired parenting related to statement of

-5-

inability to control children" (Tr. 340).  On March 27, 2009, and April 17, 2009, Ms. Loftis was seen by a nurse for home visits because of "impaired parenting related to depression" (Tr. 299, 295).  On April 24, 2009, Ms. Loftis was seen by a nurse for a home visit for several problems, including "impaired parenting" (Tr. 293).  The nurse advised Ms. Loftis and provided "intervention activities" to address the parenting problems (*Id.*).

Ms. Loftis filed a second set of initial applications on April 21, 2010 (Tr. 151, 170).  In her disability report, she listed the following medical conditions:  diabetes, depression and anxiety, neuropathy in feet and hands, missing toes on left foot, and slow learner (Tr. 178).

On July 9, 2010, Ms. Loftis was examined by Bridget Larson, Ph.D., a non-treating psychological examiner.  After reviewing Ms. Loftis's employment history, Dr. Larson stated that Ms. Loftis "denied that she has ever been fired from a job or had difficulty completing the tasks that were asked of her" (Tr. 359).

Dr. Larson administered an IQ test to Ms. Loftis.

> On the test, Christina received a Full Scale IQ of 65 that placed her in the Extremely Low range and is ranked at the 1st percentile. . . . Christina received a Verbal Comprehension IQ of 68 at the 2nd percentile, . . . which is in the Extremely Low range.  She received

-6-

> a Perceptual Reasoning IQ of 63 at
> the 1st percentile, . . . which is
> within the Extremely Low range.
> She received a Working Memory IQ of
> 80 at the 9th percentile, . . .
> which is within the Low Average
> range.  She received a Processing
> Speed IQ of 76 at the 5th
> percentile, . . . which is within
> the Borderline range.

(Tr. 360).  Scores on other "subtest scores . . . suggest that
Christina may have some difficulty completing both verbal and
nonverbal tasks; however, she may have more ease with tasks
involving short-term auditory and visual memory, sequencing
skills, mental manipulation and processing speed" (Tr. 360-61).
"Overall, Christina's intellectual functioning scores indicate
that her intellectual functioning is within the Mild Mental
Retardation range" (Tr. 361).

Dr. Larson stated that Ms. Loftis "appears to have some
difficulty maintaining social functioning as she has isolated
herself from friends and extended family and will only leave the
house when it is absolutely necessary" (*Id.*).  "She appears to be
able to carry out instructions under ordinary supervision, as
evidenced by her behavior during the present interview.  She has
the ability to sustain concentration and attention for task
completion" (*Id.*).  "She has the ability to relate appropriately
to co-workers and supervisors.  She may have some difficulty
adapting to changes in life or structure due to her anxiety"
(*Id.*).

-7-

Dr. Larson diagnosed Ms. Loftis with a GAF of 40 (Tr. 361). Dr. Larson concluded, "While her intellectual functioning may be within the Mild Mental Retardation range, she does not have accompanying deficits in skills of adaptive functioning to warrant a mental retardation diagnosis" (Tr. 362). "Presently she successfully cares for her four children and maintains the household, and in the past she has worked in the area of healthcare, looking after dying family members which indicates she has the ability to successfully carry out a number of tasks" (*Id.*). Dr. Larson stated that Ms. Loftis was capable of handling her own funds (Tr. 363).

On July 14, 2010, Christopher Milne, Ph.D., a state agency reviewing provider, completed a Mental RFC Assessment (Tr. 366-370) and Psychiatric Review Technique ("PRT") (Tr. 371-385) based on the information then available in Ms. Loftis's record, but not on an examination of Ms. Loftis. Dr. Milne stated that Ms. Loftis had a medically determinable impairment, namely "Probable BIF vs. specific learning d.o." (Tr. 372). Dr. Milne stated that Ms. Loftis had no limitations regarding restrictions of daily living, and moderate limitations as to difficulties in maintaining social functioning and concentration, persistence, or pace (Tr. 381). Dr. Milne found that Ms. Loftis was moderately limited as to the ability to understand and remember detailed instructions, carry out detailed instructions, and interact

-8-

appropriately with the general public; otherwise, she was not significantly limited (Tr. 366-67).

After citing many of Dr. Larson's conclusions, Dr. Milne stated, "It is noted she cares for her 4 children, maintains a household, has worked in healthcare in the past and cared for her ailing father.  The [claimant] does not report [special education] and that she achieved 12 yrs of education; school records were requested but not rec'd" (Tr. 383).  "The [claimant] likely would be unable to perform detailed or complex tasks, but retains the ability to perform simple and routine tasks [without] assistance" (*Id.*).

Dr. Milne stated, "[Claimant] displayed adequate understanding and memory at [previous examination] and had no difficulties completing [IQ] testing.  She retains ability to successfully perform at least s/u tasks" (Tr. 368).  He stated that "when stressed [Ms. Loftis] may not interact well with others. . . .  She may do better in positions requiring infrequent social contacts" (*Id.*).  "[M]ental health status does not reveal a level of sx intrusion that would reasonably impair ability to make routine on the job decisions, follow rules or adhere to schedules, production standards or timelines" (*Id.*).

Also on July 14, 2010, Jerry Reed, M.D., completed a Physical RFC Assessment based upon the information in the record (Tr. 386-394).  As relevant here, Dr. Reed stated, "She is

-9-

somewhat inconsistent in her presentation - she states she doesn't walk due to the [burning] pain in her feet yet she walks her children to school daily.  The [claimant is seen] as partially credible" (Tr. 391).  Dr. Reed did not give any other reason for his credibility determination.  Dr. Reed did not give any indication that he knew that Ms. Loftis's home was "not even a block away" from her children's school (Tr. 55).

Ms. Loftis's second set of initial applications were denied on May 4, 2010 (Tr. 142), and July 15, 2010 (Tr. 75).

On October 21, 2010, Gerald Spethman, M.D., completed a second, abbreviated Physical RFC Assessment (Tr. 404-405) based on the information then available in Ms. Loftis's record.  Dr. Spethman states, "Claimant not precluded from all work - affirm initial assessment dated 7/15/2010.  Claimant partially credible. -- BRB" (Tr. 404).  Dr. Spethman gave no reason for his credibility assessment.  Dr. Spethman wrote, "I have reviewed all of the evidence in file and the RFC of 7/15/2010 is affirmed" (Tr. 405).

Also on October 21, 2010, Patricia Newman, Ph.D., completed an abbreviated PRT (Tr. 402-403) based on Ms. Loftis's record.  Dr. Newman wrote, "Review of initial evidence shows IQ scores mild [mental retardation / borderline intellectual functioning] but [activities of daily living] include taking care of 4 children and do activities that are necessary" (Tr. 403).

Dr. Newman wrote that Ms. Loftis "appears capable of routine types of work with mild to moderate limits" (*Id.*). Dr. Newman's credibility assessment was identical to that of Dr. Spethman: "Claimant not precluded from all work - affirm initial assessment dated 7/15/2010. Claimant partially credible. -- BRB" (*Id.*). Like Dr. Spethman, Dr. Newman gave no reason for her credibility assessment. Dr. Newman wrote, "I have reviewed all of the evidence in file and the PRTF/MRFC of 7/15/2010 is affirmed" (Tr. 402).

Ms. Loftis's second set of initial applications were denied on reconsideration on October 21, 2010 (Tr. 77). On November 12, 2010, Ms. Loftis applied for an appellate hearing with an administrative law judge ("ALJ") for review of her claim (Tr. 100).

On November 17, 2011, Ms. Loftis was again examined by Caroline Sedlacek, Ph.D., for a second psychological interview and report ("2011 Sedlacek Report," Tr. 449-455),[2] at the request of Ms. Loftis's attorney. Dr. Sedlacek reported,

> This client is capable of carrying
> activities of daily living but
> would have difficulty carrying out
> parenting duties on her own due to
> her borderline intellectual level
> of functioning and tendency to

---

[2] In her written decision, the ALJ stated that she would "give[] the claimant the benefit of the doubt" and reopen the prior 2009 determinations so as to include this new piece of evidence (Tr. 20).

> become stressed easily.  She
> appears to be able to maintain
> social functioning consistent with
> her level of intellectual
> functioning which appears to be in
> the Borderline range.  She lacks
> good coping skills and does become
> stressed and upset easily even
> though she reported that her mood
> has been good lately.  She has the
> ability to sustain concentration
> and attention needed for task
> completion.  She has the ability to
> understand short and simple
> instructions and with repetition
> could remember them.  She needs
> more than ordinary supervision when
> first learning new tasks.  She has
> the ability to relate appropriately
> with co-workers and supervisors.
> She can adapt to simple changes in
> her environment.  She is capable of
> handling her own funds.

(Tr. 453-54).

Dr. Sedlacek's Diagnostic Impression included the following: "Axis II:  V62.89 Borderline Intellectual Functioning . . . Axis IV:  Children removed from home recently, financial concerns, lack of mental health treatment  Axis V:  55/55" (Tr. 454).  "PROGNOSIS:  Fair.  Would be improved if she received outpatient mental health counseling to learn coping skills in dealing with stress and if she participated in parenting skills classes" (*Id.*).

In response to questions from Ms. Loftis's attorney, Dr. Sedlacek stated,

> This client has had limitations
> throughout her life regarding her

emotional and intellectual
functioning.  It appears that she
had an unstable upbringing.  She
was placed in a foster home and
group homes for about a two year
period.  She missed out on some
developmental skills during that
time.  She was in special
education.  She has continued
making a marginal adjustment and
has had the same limitations before
December 31, 2006 as well as after
that date to the present time.
. . .

Her longest employment appears to
have been taking care of her father
who was diabetic and was on
dialysis.  That was not a job in
which she had to meet performance
requirements that would be expected
if employed in a more traditional
job, such as being at work at a
specific time, meeting production
requirements or deadlines and
responding well to co-workers and
supervisors.

According to the student nurses'
reports she had difficulty
parenting her children in 2008-2009
and at times felt overwhelmed by
parenting responsibilities. . . .

She does not meet mental
retardation (intellectual
disability) criteria.  Her
functioning falls within the
Borderline range of intellectual
functioning.

(Tr. 454-55).  In response to the question, "If pursuing

employment, what assistance is needed?"  Dr. Sedlacek replied,

She could benefit from services
provided by an agency such as
Vocational Rehabilitation.  She

-13-

> needs assistance in learning what
> is expected of an employee.
> Observing her in a simulated work
> experience would be important to
> evaluate her basic job skills.  She
> likely learns best by being shown a
> task rather than being told how to
> do a task.  She would need a job
> coach at the beginning of any
> employment.  She would have the
> best chance of successful
> employment in a job in which
> individuals carrying out the work
> are of lower intellectual
> functioning.  A repetitive,
> physical type of job would be
> appropriate if her obesity would
> not prevent her from performing the
> tasks.

(Tr. 455).

At Ms. Loftis's request, an administrative hearing took place on December 2, 2011, in Omaha, Nebraska, to review Ms. Loftis's SSD benefits claims (Tr. 37-74).  Ms. Loftis was thirty-five years old on the date of the hearing (Tr. 39).  At the hearing, Ms. Loftis's attorney stated to the ALJ, "The theory of the case, Your Honor, is that Ms. Loftis is unable to work because of her low IQ. . . . I believe the claimant's disabled because of her borderline intellectual functioning" (Tr. 41, 45).

As of the date of the ALJ's hearing, Ms. Loftis had never held a job for a significant period of time other than caring for family members.  Ms. Loftis cared for her grandmother in 1996 or 1997 without any problems (Tr. 50, 58).  She did not need to fill out any paperwork for the job because her aunt took

-14-

care of it (Tr. 64).  Her aunt also assisted by taking Ms. Loftis

and her grandmother grocery shopping and to doctor's appointments

(Tr. 64-65).  Ms. Loftis would prepare meals and help her

grandmother with medications, with supervision by Ms. Loftis's

aunt (Tr. 65).  Ms. Loftis's aunt "would come over and check it

out, make sure that I had given the right amounts. . . [b]ecause

I had never done it before.  She wanted to make sure I was doing

it right" (*Id.*).  Ms. Loftis testified that she did not think she

could return to that kind of job now:  "No, because it was just

-- it was with family that I took care of.  I wouldn't be able to

do that with somebody else" (Tr. 58-59).  When her attorney asked

her why not, Ms. Loftis replied, "Because it would depend on

their situation, and if I had to give them medicine, I couldn't

do that because I'm not licensed.  If I had to cook, it would

depend on if, you know, they were allergic to things" (Tr. 59).

Ms. Loftis worked at a Blimpie sandwich shop for "a

couple months" in about 1998 but "the job stopp[ed]" because she

was too slow (Tr. 50, 56).  She worked at Mama's Pizza for about

four months in 1999 but, again, "the job stopp[ed]" because she

was too slow (Tr. 51, 55).

Ms. Loftis cared for her father in his home for almost

four years, from April 2003 to December 2006 (Tr. 49, 179).  She

was paid by the Nebraska Office on Aging (Tr. 50).  Ms. Loftis

would assist her father with his medications and his insulin (Ms.

Loftis herself is a diabetic) and would cook his meals (Tr. 49).
Her brothers, however, would help him bathe (Tr. 49-50).  In
response to the question, "And did you have any problems
performing that job for your dad?", Ms. Loftis testified, "No
because it was my dad, I knew what to do" (Tr. 58).  She did have
problems filling out a billing statement relating to the job,
however, but received help with this (*Id.*).

     Ms. Loftis typically spends the day in her home doing a
few chores and watching television (Tr. 51-52).  She goes to the
grocery store once a month with her husband; they do not prepare
a list (Tr. 52, 61).  She does not plan meals ahead of time (Tr.
52).  She does not typically follow a recipe when cooking unless
she is baking during the holidays, when she sometimes needs help
understanding the recipe (Tr. 61-62).  Ms. Loftis does not do any
reading but sometimes uses her phone to access Facebook or find a
phone number on the Internet, or sometimes to text (Tr. 53).
When her children are in the home she walks the two youngest to
school, which is "not even a block away" (Tr. 55).

     Ms. Loftis testified that she is a slow reader and that
she has trouble with big words (Tr. 59-60).  With regard to the
initial denial of her 2009 disability application, Ms. Loftis
testified that she remembered getting a denial letter from Social
Security and that she read the front of the letter, but that she
did not understand what she had to do to appeal the denial:  "I

read some of it, but I didn't finish reading all of it because I didn't understand it.  I didn't appeal.  I'd never done it before" (Tr. 60).

After Ms. Loftis's testimony, the ALJ posed the following hypothetical to the vocational expert:

> I'm going to ask you to consider an individual of the claimant's age, educational level, and work history.  From a physical standpoint, the individual is in the light category of work, may occasionally climb and balance, and should avoid concentrated exposure to hazards.  And in addition, from a mental standpoint, the individual has moderate limitations, which means less than moderate but more than mild in the following areas: The ability to understand and remember detailed instructions, the ability to carry out detailed instructions, and the ability to interact appropriately with the general public.  In addition, the individual can perform simple and routine tasks without assistance and needs a job with infrequent social contacts.
>
> Would the individual be able to do the past work that the claimant has done?

(Tr. 66-67).  Based on the hypothetical, the vocational expert answered, "[N]o" (Tr. 67).

When asked by the ALJ if there were "other jobs that such an individual could perform," the vocational expert testified that "we're looking at a minimum of public interaction

-17-

and avoidance of hazards in the light, unskilled category" (*Id.*).
As such, the vocational expert testified that jobs as a
"production assembler," "hand packager," or "housekeeping
cleaner" would meet the criteria set forth in the ALJ's
hypothetical (Tr. 67-68).

Ms. Loftis's attorney also asked questions of the
vocational expert at the hearing:

> For my first hypothetical, I want
> you to assume someone with no
> physical limitations prior to
> December 31, 2006, but this
> individual would have the following
> mental limitations:  A fullscale IQ
> of 65, verbal comprehension IQ of
> 68, perceptual reasoning IQ of 63,
> working memory IQ of 80, processing
> speed IQ of 76.  This person would
> have difficulty maintaining
> concentration and attention needed
> for task completion, based off Dr.
> [Sedlacek's 2009] report at 1-F,
> page 5.  Further, based off that
> report, this person would have
> difficulty -- or some difficulty
> remembering short and simple
> instructions, even though she might
> be able to understand them.  And
> even when she can remember short
> and simple instructions, she would
> need some additional supervision in
> order to carry out those
> instructions.  This person could
> relate to co-workers and
> supervisors in a shy, nervous
> manner.  This person can adapt to
> simple changes in her environment
> but functions better, of course, in
> a predictable structured
> environment.

-18-

> With those limitations, is there
> any competitive work that exists in
> the national economy?

(Tr. 68-69).  The vocational expert testified,

> I believe there are two things that
> really stand out in your whole
> hypothetical.  One is the concept
> of additional supervision.  The
> other is needing a predictable
> structured environment.  Both of
> those speak to workshop settings,
> at least a job coach, to initially
> get a person started if they
> weren't at a workshop.  But the
> predictable structured environment
> and the additional supervision both
> point to, largely to workshop
> settings.

(Tr. 69).

The vocational expert testified that he didn't believe
that any competitive work would exist in the national economy
under the facts of the hypothetical, and that such a person would
need the accommodation of "additional supervision . . . probably
. . . a job coach or workshop setting" (Tr. 69-70).  Based on his
previous experience handling a "developmental, disabled case
load," the vocational expert testified, "Those -- IQ scores like
those, the additional -- they would point to additional
supervision and structured environment.  So, I guess, those
scores would backup those other elements that I brought out" (Tr.
70).  When asked, "So in your experience, scores like that
usually suggest a structured work environment?", the vocational
expert answered, "Yes.  Usually, yes" (*Id.*).

-19-

For his second hypothetical, Ms. Loftis's attorney

stated,

> I want you to assume someone that
> pre-December 31, 2006, has no
> physical restrictions but based off
> 19-F [the 2011 Sedlacek Report] has
> the following limitations:  This
> person's capable of activities of
> daily living but would have
> difficulty carrying out parenting
> duties on her own due to borderline
> intellectual level of functioning
> and has a tendency to become
> stressed easily.  She appears able
> to maintain social functioning
> consistent with her level of
> intellectual functioning, which
> appears to be in the borderline
> range.  She lacks good coping
> skills and does become stressed and
> upset easily, even though she
> reported that her mood has been
> good lately.  She has the ability
> to sustain attention and -- or
> excuse me -- sustain concentration
> and attention needed for task
> completion.  She has the ability to
> understand short and simple
> instructions and with repetition
> could remember them.  She needs
> more than ordinary supervision when
> first learning tasks.  She has the
> ability to relate appropriately
> with co-workers and supervisors.
> She can adapt to simple changes in
> her environment.  She would benefit
> from services provided by an
> agency, such as vocational
> rehabilitation.  She needs
> assistance in learning what is
> expected of an employee.  Observing
> her in the simulated work
> experience would be important to
> evaluate her basic job skills.  She
> likely learns best by being shown a
> task rather than told how to do a

-20-

> task.  She would need a job coach
> at the beginning of any employment.
> She would have the best chance of
> successful employment in a job in
> which individuals carrying out the
> work are of lower intellectual
> functioning.  A repetitive physical
> type of job would be appropriate if
> her obesity would not prevent her
> from performing the tasks.
>
> Is there any competitive work that
> exists in the national economy with
> those limitations?

(Tr. 70-72).  The vocational expert replied, "I would say the overall picture is that she would be ready for non-competitive employment only" (Tr. 72).  In addition, with regard to Ms. Loftis's work as a home attendant to family members, the vocational expert testified that she "may have" performed the work as it is performed competitively in the economy, but

> one of the things in her testimony
> that she had discussed with regard
> to her other jobs was slowness.
> And in that particular job setting,
> working for family, speed was
> really not -- not of the essence.
> So she probably performed -- as she
> had indicated in her other past
> jobs, she probably performed it
> slower than usual.

(*Id.*).  The vocational expert testified that he did not know whether performance of such a home attendant job would require certification as a medication aide (*Id.*).

On January 11, 2012, the ALJ issued an unfavorable opinion affirming the denial of Ms. Loftis's SSD benefits claims

-21-

(Tr. 20-31).  The ALJ evaluated Ms. Loftis's claims under the SSA's five-step sequential process.  *See* 20 C.F.R. § 404.1520(a). At step one, the ALJ found that Ms. Loftis had not engaged in substantial gainful activity since December 31, 2006, the alleged onset date of her disability (Tr. 22).

At step two, the ALJ found that Ms. Loftis's impairments, borderline intellectual functioning, diabetes with neuropathy, obesity, hypertension, partial amputation of digits on the left foot, depression, and anxiety, were severe (Tr. 23). But the ALJ also concluded, "The evidence indicates only the claimant's borderline intellectual functioning was a severe medically determinable impairment at the time of the alleged onset date and the date last insured.  The remaining impairments listed above are not established as severe until after the date last insured" (*Id.*).

At step three, the ALJ found that Ms. Loftis's impairments did not meet one of the listed impairments found in 20 C.F.R. Part 404, Subpart P, Appendix 1 (*Id.*).  The ALJ stated, "Although the claimant has a full-scale IQ of 65, the evidence does not satisfy the criteria of listing 12.05.  Her functioning is not in the mental retardation range, but falls within the borderline intellectual range based on her adaptive functioning" (Tr. 24).  Yet the Court notes that in analyzing the issue, the ALJ stated, "In activities of daily living, the claimant has no

-22-

restriction.  She was able to care for her ailing father and her 4 children. . . . She has been able to maintain relationships with her family and relate appropriately to others . . . ." (Tr. 23-24).  This statement is plainly false, since at least as of the date of the hearing, Ms. Loftis's children had been placed in foster care due to her allegedly inappropriate behavior with another child.  Thus, at least as of that date, she was not allowed to care for her four children and was not able to maintain normal relationships with her family.

Next, the ALJ determined that Ms. Loftis had a residual functional capacity

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can only occasionally climb and balance, and she should avoid concentrated exposure to hazards.  Due to her mental impairments, the claimant has moderate limitation, which is less than marked but more than mild limitation, in the ability to understand, remember, and carry out detailed instructions and interact appropriately with the general public.  She can perform simple and routine tasks without assistance but needs a job with infrequent contacts.

(Tr. 24-25).  While the ALJ found Ms. Loftis's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," nevertheless, the ALJ found that Ms. Loftis's "statements concerning the intensity, persistence, and

limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment" (Tr. 25).

The ALJ devoted a large portion of her opinion to the evaluation of Ms. Loftis's physical maladies, even though Ms. Loftis's attorney had stated at the outset of the hearing that only the borderline intellectual functioning impairment was at issue.  With regard to Ms. Loftis's borderline intellectual functioning, the ALJ repeated many of the findings made by Dr. Sedlacek and Dr. Larson, including Dr. Sedlacek's opinion that Ms. Loftis "would need more than ordinary supervision when learning new tasks," "could benefit from Vocational Rehabilitation services," and "would need a job coach" (Tr. 28). Yet the ALJ concluded, "The observations, assessments, and opinions by Dr. Sedlacek and Dr. Larson are given *some* weight. Neither indicates the claimant's mental functioning precludes employment.  The difficulties and limitations addressed in their reports support the moderate mental limitations [in the RFC] outlined above" (*Id.* (emphasis added)).  In contrast, the ALJ stated, "Dr. Reed, Dr. Spethman, Dr. Milne, and Dr. Newman are acceptable medical sources.  Their assessments [are] given *great* weight because they are supported by the evidence and consistent with the record as a whole.  They support the above residual functional capacity assessment" (Tr. 29 (emphasis added)).

-24-

The ALJ questioned the credibility of Ms. Loftis, stating,

> The claimant's own statements and activities are inconsistent with the alleged severity of her impairments. . . . She testified that she had no problems understanding jobs in the past and she can read basic things.  The claimant last worked taking care of her father.  She also described providing care for her 4 children before they were put in foster care and is hopeful to get them back.  She said she makes coffee, lets the dogs out, picks up stuff in the house, sits awhile, watches television, and checks the mail.  The claimant also said she does laundry, drives, and goes grocery shopping.  She listed her household chores as including cleaning the bathroom, sweeping, mopping, dusting, and doing dishes.  She said she uses the internet for Facebook or looking up numbers, sometimes she texts, she talks to family every other day, and she can care for her own hygiene.

(Tr. 28-29).  The ALJ did not explain why Ms. Loftis's ability to engage in these activities of daily living would translate into the ability to function in the workplace without unusual accommodation or the "need" for a job coach as the ALJ quoted from Dr. Sedlacek.

At step four, the ALJ found that Ms. Loftis was unable to perform any past relevant work (Tr. 29).  At step five, after noting that Ms. Loftis "has at least a high school education,"

-25-

the ALJ found that "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform" (Tr. 29, 30).  Consequently, the ALJ concluded her unfavorable decision by stating, "The claimant has not been under a disability, as defined in the Social Security Act, from December 31, 2006 through the date of this decision" (Tr. 30).

On March 9, 2012, Ms. Loftis requested review of the ALJ's decision by the SSA's Appeals Council (Tr. 7).  On April 25, 2012, the Appeals Council declined Ms. Loftis's request for review; thus the ALJ's decision is now the final decision of the SSA (Tr. 1).  Ms. Loftis timely filed a complaint with the United States District Court for the District of Nebraska on June 22, 2012 (Filing No. 1).

## II.  DISCUSSION

A.  **Standard of Review**.

When reviewing an ALJ's decision, the Court "must determine 'whether the ALJ's decision complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole.'"  *Martise v. Astrue*, 641 F.3d 909, 920 (8th Cir. 2011) (quoting *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010)).  "Substantial evidence" is:

> relevant evidence that a reasonable
> mind might accept as adequate to

-26-

> support a conclusion.  Substantial
> evidence on the record as a whole,
> however, requires a more
> scrutinizing analysis.  In the
> review of an administrative
> decision, the substantiality of
> evidence must take into account
> whatever in the record fairly
> detracts from its weight.  Thus,
> the court must also take into
> consideration the weight of the
> evidence in the record and apply a
> balancing test to evidence which is
> contradictory.

*Id.* at 920-21.  "'If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'"  *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).  The Court may not reverse the ALJ's decision "simply because [the Court] would have come to a different conclusion."  *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011)(citation omitted).  "The claimant bears the burden of proving disability."  *Id.* at 615.

**B.  The ALJ's Decision is not Supported by Substantial Evidence in the Record as a Whole.**

**1.  Dr. Sedlacek's Opinions and the ALJ's RFC Assessment.**  Dr. Sedlacek examined Ms. Loftis on two occasions, in 2009 and 2011.  In fact, Dr. Sedlacek is the only physician / psychologist who interviewed Ms. Loftis twice for the primary purpose of evaluating Ms. Loftis's borderline intellectual

-27-

functioning.  Yet without identifying any particular deficiencies
in Dr. Sedlacek's reports, the ALJ gave only "some weight" to Dr.
Sedlacek's opinions.  In contrast, the ALJ gave "great weight" to
Drs. Reed, Spethman, Milne, and Newman, particularly with regard
to the formation of the ALJ's RFC, even though they performed
only a review of the record and did not personally examine Ms.
Loftis.

In 2009, Dr. Spethman, too, evaluated Ms. Loftis for a
physical RFC, and not for an assessment of her intellectual
functioning.  At that time, he found her to be credible.  When
Dr. Spethman reviewed the record a second time in 2011, he wrote,
"Claimant not precluded from all work - affirm initial assessment
dated 7/15/2010.  Claimant partially credible. -- BRB" (Tr. 404).
Dr. Spethman gave no reason for his reduction in her credibility
assessment.

-28-

Dr. Milne did perform a mental RFC evaluation, but only on the record and without examining Ms. Loftis.  Dr. Milne stated, "It is noted she cares for her 4 children, maintains a household, has worked in healthcare in the past and cared for her ailing father," attributing Ms. Loftis with greater abilities because of her care of four children, but, again, not knowing that she would be deemed by Child Protective Services to be unfit to care for them, at least temporarily (Tr. 383), and ignoring the fact that Ms. Loftis needed several nurse home visits in 2008 and 2009 for interventions due to "impaired parenting." Similarly, Dr. Milne did not acknowledge the help Ms. Loftis received from family members when she "worked in health care."

Dr. Milne also attributes importance to Ms. Loftis's success in high school:  "The [claimant] does not report [special education] and that she achieved 12 yrs of education; school records were requested but not rec'd" (Tr. 383).  While Ms. Loftis did graduate from high school, the record suggests that she took special education classes throughout her academic career.  Although graduating from high school was a laudable and important achievement for Ms. Loftis, her diploma, based on a special education curriculum, does not have the same vocational significance that it might otherwise.  Based on this misunderstanding of her ability to care for four children and the education she received, Dr. Milne concluded, "The [claimant]

likely would be unable to perform detailed or complex tasks, but retains the ability to perform simple and routine tasks [without] assistance" (*Id.*).

Finally, Dr. Newman completed an abbreviated PRT (Tr. 402-403) based only on the record.  As with Dr. Milne, Dr. Newman attaches significance to the ability to care for four children: "Review of initial evidence shows IQ scores mild [mental retardation / borderline intellectual functioning] but [activities of daily living] include taking care of 4 children and do activities that are necessary" (Tr. 403).  Dr. Newman wrote that Ms. Loftis "appears capable of routine types of work with mild to moderate limits" (*Id.*).  Disturbingly, Dr. Newman's credibility assessment was identical to that of Dr. Spethman's second credibility assessment:  "Claimant not precluded from all work - affirm initial assessment dated 7/15/2010.  Claimant partially credible. -- BRB" (*Id.*).  Since both reports were created on the same day, it is unclear which one was written first.  Like Dr. Spethman, Dr. Newman gave no reason for her credibility assessment.

In consideration of the foregoing, the Court finds that greater weight should be given to the 2009 and 2011 Sedlacek Reports, and lesser weight should be given to the reports of Drs. Reed, Spethman, Milne, and Newman.  The Court finds that the ALJ's RFC simply does not encompass the salient features of Ms.

-30-

Loftis's impairment as noted in Dr. Sedlacek's reports.  The fact is that Ms. Loftis has never successfully held a job for any significant length of time other than caring for her father and her grandmother in a family home setting, with assistance from other family members.  She was, apparently, in special education for much of her academic career.  When her children were living with her, she received intervention for "improper parenting." She has been deemed incapable of caring for her children, at least for a time, even with her husband living with them in the home, such that the last information available to the Court indicated that the children were in foster care.  She rarely leaves the home and has the support of her husband for an activity as simple as going to the grocery store, which she only does once a month.  Her IQ is technically in the mild mental retardation stage, although she is able to function at a slightly higher, borderline level.  According to Dr. Sedlacek, who personally examined Ms. Loftis twice,  Ms. Loftis "would need more than ordinary supervision when learning new tasks," "could benefit from Vocational Rehabilitation services," and "would need a job coach."  Thus, the Court finds that the RFC developed by the ALJ was not properly supported by substantial evidence in the record, particularly as applied to Ms. Loftis's intellectual functioning, which was the appropriate focus of the inquiry.

2.   **Vocational Expert Testimony**.  "A hypothetical question posed to the vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true by the ALJ.  The hypothetical question must capture the concrete consequences of the claimant's deficiencies." *Hunt v. Massanari*, 250 F.3d 622, 625 (8th Cir. 2001) (internal citations omitted). "When a hypothetical question does not encompass all relevant impairments, the vocational expert's testimony does not constitute substantial evidence." *Hunt*, 250 F.3d at 626.  "Testimony from a vocational expert constitutes substantial evidence only when based on a properly phrased hypothetical question." *Grissom v. Barnhart*, 416 F.3d 834, 837 (8th Cir. 2005) (quotation omitted).  "Time and again, this court has concluded that borderline intellectual functioning, if supported by the record as it is here, is a significant nonexertional impairment that must be considered by a vocational expert." *Swope v. Barnhart*, 436 F.3d 1023, 1025 (8th Cir. 2006) (quotation omitted).

In this case, the ALJ's hypothetical question, based on her RFC assessment, did not adequately encompass Ms. Loftis's limitations as evident by the record as a whole.  In particular, because the vocational limitations identified by Dr. Sedlacek were not included, the Court finds that the question did not fully address Ms. Loftis's borderline intellectual functioning as

-32-

relevant to the workplace.  In contrast, the Court finds that Ms. Loftis's attorney's hypothetical questions, which did encompass the limitations identified by Dr. Sedlacek and Dr. Larson, accurately reflected the evidence in the record as a whole and "capture[d] the concrete consequences of the claimant's deficiencies." *Hunt*, 250 F.3d at 625.  Consequently, the Court accepts the vocational expert's testimony, in response to Ms. Loftis's attorney's hypothetical questions, that Ms. Loftis "would be ready for non-competitive employment only" (Tr. 72). The Court finds that because Ms. Loftis is unable to engage in competitive work due to her borderline intellectual functioning, she has been under a disability, as defined by the Social Security Act, since December 31, 2006.

### III.   CONCLUSION

The SSA's decision will be vacated, and this matter remanded for the award of SSD benefits to Ms. Loftis.  A separate order will be entered in accordance with this memorandum opinion.

DATED this 11th day of April, 2013.

BY THE COURT:

/s/ Lyle E. Strom

_____
LYLE E. STROM, Senior Judge
United States District Court

-33-